STATE OF CONNECTICUT *v.* JAY INGRAM
(14844)

Heiman, Hennessy and Healey, Js.

Argued September 16—officially released December 24, 1996

*Lisa M. Bologna* and *Cameron Dorman*, certified legal interns, with whom was *Richard Emanuel*, assistant public defender, for the appellant (defendant).

*Paul J. Ferencek*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's

attorney, and *Michael A. Pepper*, assistant state's attorney, for the appellee (state).

HEALEY, J. The defendant, Jay Ingram, appeals from the judgment of conviction, rendered after a jury trial, of three counts of robbery in the second degree in violation of General Statutes § 53a-135 (a) (2),[1] as lesser included offenses of robbery in the first degree, and one count of commission of a class C felony with a firearm in violation of General Statutes § 53-202k.[2] The trial court imposed concurrent ten year sentences for each of the three counts of second degree robbery, and a consecutive five year sentence for commission of a class C felony with a firearm, for a total effective sentence of fifteen years.[3] On appeal, the defendant claims that (1) the evidence was insufficient to establish his identity as the individual who committed the robbery, (2) his double jeopardy rights were violated by his con-

[1] General Statutes § 53a-135 provides: "Robbery in the second degree: Class C felony. (a) A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present; or (2) in the course of the commission of the crime or of immediate flight therefrom he or another participant in the crime displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument.

"(b) Robbery in the second degree is a class C felony."

[2] General Statutes § 53-202k provides: "Commission of a class A, B or C felony with a firearm: Five-year nonsuspendable sentence. Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[3] Following jury selection, the defendant pleaded guilty to possession of narcotics in violation of General Statutes § 21a-279 (a) and admitted a charge of violation of probation. The trial court accepted the guilty plea on the narcotics count, but reserved imposing sentence on it pending the outcome of the trial on the remaining charges. The trial court imposed an additional three year sentence for each of those charges, to run concurrently with the conviction of three counts of robbery in the second degree.

viction and punishment on three separate counts of robbery rather than one, and (3) his double jeopardy rights were violated by his conviction and cumulative punishment for the crimes of robbery in the second degree and commission of a class C felony with a firearm. We affirm the judgments of the trial court.

The jury could reasonably have found the following facts. At approximately 9:50 a.m. on March 22, 1994, a man wearing a green hooded sweatshirt, a purple ski mask and a glove on his left hand, entered a branch of the Bank of New Haven at 395 Whalley Avenue in New Haven. The man was holding a black gun in his right hand and a heavy plastic bag with drawstrings in his left hand. During the robbery, the robber's mask covered most of his face, and the witnesses were later able to describe him only as a tall, slim black male. Five employees were present: the branch manager was at a teller station; a customer service representative, Elizabeth Rios, was at her desk near the entrance; and three tellers, Tim Holland, Elizabeth Alsever and Angela Vigliotto, were at their respective teller windows. Several customers were also present. The robber faced the first teller station, pointed the gun at Holland and said, "This is a hold-up." He went to Holland's window, put the plastic bag over the counter and demanded money. Holland placed money from his cash drawer into the bag, including "bait money"[4] and money containing a "dye pack."[5] The robber then sequentially approached each of the other two tellers' windows and demanded money. Each of the other tellers put money, including bait money, into the bag, and one of them placed money containing another dye pack into the bag.

---

[4] The "bait money" consisted of $50 bills the serial numbers of which had previously been recorded by the bank.

[5] The "dye pack" consisted of a gaseous cartridge of explosive red dye inserted inside a hollow portion of a roll of currency. The electronic device that activates the explosive action in the dye pack is located in the front door of the bank and the explosion takes place ten seconds thereafter.

The robber walked to the front doors near Rios' desk, pushed them slightly ajar, turned back and swept the gun across the room at the tellers, and eventually pointed it directly at Rios. Then he fled across Whalley Avenue carrying the bag of money. As he did so, Rios saw the dye packets explode, spewing red and pink smoke from the bag. The robber then ran behind a brick building on the opposite side of Whalley Avenue. In searching the area after the robbery, the police found fresh footprints in a muddy area behind the brick building. The footprints led east onto Winthrop Avenue, about one block from the bank. The bank's video cameras captured most of the robbery on tape. Enlarged photographs of the robber were made from the bank's security videotape. The videotape itself was admitted at trial and was viewed by the jury. The robber was in the bank for approximately thirty seconds. None of the eyewitnesses was able to identify the defendant as the robber.

In March, 1994, the defendant, who is a slim black male, six feet one inch in height, resided in a second floor apartment at 681 Elm Street, New Haven, with Jolynn Wilson, their infant son, and Wilson's two other young children. Winthrop Avenue intersects Elm Street within one block of the defendant's apartment. On March 22, 1994, shortly before 9 a.m., Wilson asked the defendant to care for their son while she went to purchase a used car. The defendant refused, claiming that he had an appointment elsewhere that morning. Wilson left the apartment at about 9 a.m., taking their infant son with her.

When Wilson arrived home about one and one-half hours later, the defendant was in the bathroom with wet, red-stained United States currency spread out in the sink and bathtub. He was attempting to bleach the stains off the money. When Wilson asked where the money had come from, the defendant claimed that he

had found it.[6] Wilson ordered the defendant to get the money out of the apartment. The defendant left the apartment with the money in a black fanny bag and, without Wilson's knowledge, placed it in a hall closet outside the apartment entrance. He then left the building.

A few days later, the New Haven police, on the basis of information from a confidential source that the defendant was the perpetrator of the bank robbery, secured a warrant to search the defendant's apartment at 681 Elm Street, which was located one and one-half blocks from the bank. They executed the warrant on March 29, 1994, at 6 a.m. The defendant was not home at the time of the search, but Wilson and the children were. The police seized a number of pieces of evidence from various locations in the apartment: a red-stained clorox bleach bottle and various items of red-stained men's, women's and children's clothing from a washroom area; a magazine for a semiautomatic pistol containing two live rounds of ammunition and a purple ski mask[7] from a nightstand drawer and bureau, respectively, in Wilson's bedroom, which she shared with the defendant; a plastic toy gun from a milk crate filled with other children's toys; numerous scraps of torn, charred, red and pink stained United States currency from a plastic waste can located in the rear area of the apartment; a black fanny bag filled with damp, stained currency from the exterior hallway closet; and a green hooded shirt.

During the police search, the defendant entered the building but fled immediately upon seeing a plainclothes detective standing at the top of the stairs outside the second floor apartment. The police chased the defendant and found him hiding in the basement of 278

---

[6] The defendant testified that he had obtained the money in a drug deal.

[7] The defendant testified that he owned the magazine and the mask.

Sherman Avenue, a few blocks away. The defendant testified that he ran away when he saw the police because he had sixteen bags of cocaine on his person.[8] He was taken into custody, and the police found sixteen packets of cocaine on his person.

The serial number on a $50 bill seized in the defendant's apartment was the same as one recorded on the bank's bait money log sheet. A bank security officer testified that when a dye pack explodes, the currency closest to the gas cartridge burns, while the remaining currency becomes stained with red dye. A police inspector with extensive experience investigating bank robberies testified that he inspected the currency and fragments seized from the defendant's apartment and concluded that their condition was consistent with having been exposed to a dye pack explosion. A New Haven police detective who participated in the search testified that he had investigated several prior bank robberies and that he was familiar with the results of a dye pack explosion. He testified that in his opinion the clothing taken from the defendant's apartment had been stained through contact with a person or item that had been exposed to an exploding dye pack. The stains on the clorox bottle and clothing indicated that those items had made contact with someone or something which had been exposed to an exploding dye pack. The ski mask seized in the search was of the same style, shape and color as that worn by the bank robber. The toy gun seized was similar to that displayed by the robber in the robbery.

I

The defendant first claims that the evidence was insufficient to establish, beyond a reasonable doubt, that he was the perpetrator of the robbery at the Bank

---

[8] During his testimony, the defendant admitted that he had eleven felony convictions and that he had sold drugs in the past.

of New Haven on March 24, 1994. To have arrived at its verdict, he argues, the jury had to resort to speculation and conjecture and to draw unwarranted inferences from the facts presented. He contends that there was nothing distinctive or unique about the perpetrator's racial or physical characteristics, that the items seized from the washing machine and laundry area on March 29, 1994, "are of little probative value," that none of the stains or discolorations on the clorox bleach bottle or clothing were ever forensically tested so as to show that they were caused by dye from a dye pack, that neither the magazine or toy gun were material factors in circumstantially proving identity and that the green hooded shirt was "another red herring" in that its only use as evidence "was its tendency to confuse or mislead the jury." While conceding that "unquestionably" the seized red-stained currency was "inculpatory," he argues that the fact that "the state's proof on the element of identity was almost entirely dependent on circumstantial evidence," and given the "relative absence of other inculpatory factors," the possession of the currency alone was not sufficient to prove that he was the robber.

In denying that he was the perpetrator, the defendant, who testified in his own behalf, said that he came into possession of the dye-stained and bait money as the result of a drug transaction that took place on March 22, 1994, in his apartment at 681 Elm Street while Wilson was out. The defendant said that one of his drug customers came to buy drugs and he sold the customer $500 worth of crack cocaine in return for which the defendant received $625 in red-stained money. The defendant said he charged the premium because he was not sure that he could spend the stained money. When Wilson returned to the apartment and saw him in the bathroom as he was washing and trying to bleach out the red stain from the currency, she yelled at him to get it out

of the house. He did gather it up and left the apartment with the currency in a fanny bag. Without telling Wilson, he put the fanny bag in a hall closet just outside the apartment. In his testimony, the defendant said that he ran from 681 Elm Street on March 29, 1994, when he saw the police because he had sixteen bags of cocaine on his person.

Our Supreme Court has stated: "In reviewing [a] sufficiency [of evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993); *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg*, 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. *State* v. *Carter*, [196 Conn. 36, 44, 490 A.2d 1000 (1985)]. It is within the province of the jury to draw reasonable and logical inferences from the facts proven. Id.; *State* v. *Williams*, 169 Conn. 322, 336, 363 A.2d 72 (1975). The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. *State* v. *Williams*, 202 Conn. 349, 355, 521 A.2d 150 (1987); *State* v. *Carter*, supra, 44–45; *State* v. *Gabriel*, 192 Conn. 405, 425, 473 A.2d 300 (1984) . . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are 'so unreasonable as to be unjustifiable.' " (Citations omitted.) *State* v. *Ford*, 230 Conn. 686, 692,

646 A.2d 147 (1994). "We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989)." *State* v. *Lago*, 28 Conn. App. 9, 30, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992). It has been "repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. *State* v. *Haddad*, 189 Conn. 383, 390, 456 A.2d 316 (1983); *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981). It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. *State* v. *Perez*, supra, 227 . . . . *State* v. *Braxton*, [196 Conn. 685, 691, 495 A.2d 273 (1985)]." (Internal quotation marks omitted.) *State* v. *King*, 216 Conn. 585, 602, 583 A.2d 896 (1990); *State* v. *Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984). "[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 619 A.2d 179 (1992). In doing so, we keep in mind that "[w]e have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." *State* v. *Rodriguez*, 200 Conn. 685, 693, 513 A.2d 71 (1986). The state had the burden of proving beyond a reasonable doubt the defendant's identity as the robber; *State* v. *Shanks*, 34 Conn. App.

103, 120, 640 A.2d 155, cert. denied, 229 Conn. 921, 642 A.2d 1216 (1994); and the issue of the identity of the defendant as the robber was one of fact for the jury. See *State* v. *Harris*, 227 Conn. 751, 758, 631 A.2d 309 (1993); *State* v. *Smith*, 138 Conn. 196, 201, 82 A.2d 816 (1951); *State* v. *Roy*, 38 Conn. App. 481, 488, 662 A.2d 799 (1995), cert. denied, 237 Conn. 902, 674 A.2d 1333 (1996); *State* v. *Rivera*, 32 Conn. App. 193, 201–202, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993). To convict the defendant of robbery in the second degree, the state must prove beyond a reasonable doubt (1) that this defendant committed robbery as defined in General Statutes § 53a-133;[9] *State* v. *Shanks*, supra, 120; and (2) that, in the course of the commission of the crimes or of immediate flight therefrom, he displayed or threatened the use of what he represented by his words or conduct to be a deadly weapon or dangerous instrument. See General Statutes § 53a-135.

Applying the foregoing principles to the facts that the jury reasonably could have found from the evidence, we are not persuaded by the defendant's claim that the evidence was insufficient to support the jury's verdict. In assessing the credibility of the witnesses, the jury had sufficient evidence, albeit circumstantial, to con-

---

[9] General Statutes § 53a-133, entitled "Robbery defined," provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

General Statutes § 53a-119, entitled "Larceny defined," provides in pertinent part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

General Statutes § 53a-118 (a) (5) provides: "An 'owner' means any person who has a right to possession superior to that of a taker, obtainer or withholder."

clude that this defendant was the person who committed the robbery charged. The evidence included not only that from witnesses, but also exhibits, including the videotape of the robbery itself. The robber was described by bank employees as a tall slim black male who wore a purple ski mask. The jury viewed the robbery on the videotape and also observed him in court during the trial, including while he testified. As to his height, he himself testified that he was "six one something." He admitted that he owned the purple ski mask seized by the police from his apartment. There was testimony from bank employees that this mask was consistent in shape and color with the mask worn by the robber. The jury had the opportunity to view enlarged photographs of the robber holding the "gun" he brandished during the robbery to compare it with the photographs of the plastic toy gun (shaped like an automatic pistol) that was seized by the police from his apartment. There was also in evidence a photograph of a $50 bill seized by the police the serial number of which matched the serial number of a $50 bill shown in the bank's bait money log. The jurors also heard Rios testifying that the dye pack exploded as the robber ran across Whalley Avenue. The jury heard Wilson testify that, on the morning of the robbery, she observed the defendant in the apartment bathroom washing currency with bleach, trying to remove the red stains from the currency he had spread out there. There was also in evidence the red-stained clorox bottle and stained clothing seized by the police. Among the exhibits were numerous scraps of torn, charred, red and pink stained currency seized from a plastic waste can located in the rear of the defendant's apartment. When Wilson ordered the defendant, after she saw him with the money in the bathroom, to get it out of the apartment, he put it in a black fanny bag in the hallway closet outside the apartment. The defendant did not tell Wilson that he had done this. When the

police conducted their search on March 29, 1994, they found a black fanny bag filled with damp, stained currency in that closet.

The jury heard the defendant testify as to how he came to have the money and relate the surrounding circumstances, including the alleged drug transaction. The defendant did not recall the name of the drug buyer, and he said that he had not seen him since that time.

Although the defendant concedes that the possession of the seized stained currency is inculpatory, he argues that, given the "relative absence of other inculpatory factors," the possession of the currency alone was not sufficient to prove that he was the robber. That is hardly the end of the matter. Rather, the cumulative effect of all the evidence must be considered in the light of all the principles we have set out above. *State* v. *Bruno*, 236 Conn. 514, 538–40, 673 A.2d 1117 (1996). This, of course, includes the evidence of the three tellers, the customer service representative, the bank security officer and police officers, as well as that of the defendant and Wilson. Moreover, "[i]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Sparks*, 39 Conn. App. 502, 517, 664 A.2d 1185 (1995); *State* v. *Riccio*, 41 Conn. App. 847, 852, 678 A.2d 981 (1996); *State* v. *Patterson*, 35 Conn. App. 405, 414, 646 A.2d 258, cert. denied, 231 Conn. 930, 649 A.2d 254 (1994).

Having carefully reviewed the record, we conclude that the cumulative effect of the evidence, construed in the light most favorable to sustaining the verdict,

was sufficient to support the verdict of guilty as charged beyond a reasonable doubt. The defendant's identification was established through circumstantial evidence sufficient to allow the jury to find beyond a reasonable doubt that he was the perpetrator of the crimes charged.

## II

Next, the defendant claims that his conviction and punishment on three counts of robbery in the second degree violated his federal and state constitutional rights against double jeopardy. In doing so, he first refers to the statutes that he maintains are involved, General Statutes §§ 53a-134 (a) (4)[10] (robbery in first degree with which he was charged), 53a-135 (a) (2) (robbery in second degree), 53a-133 (from which definition of robbery is incorporated in first two statutes), 53a-119[11] (which defines "larceny") and 53a-118 (a) (5) (which defines "owner").[12] The defendant claims that the express language of these statutes does not clearly indicate whether the legislature intended to authorize multiple punishments, under the same robbery statute, for the hold-up of two or more tellers during a single criminal episode. Further, the defendant contends that

---

[10] General Statutes § 53a-134 provides in pertinent part: "Robbery in the first degree: Class B felony. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime. . . ."

[11] See footnote 9.

[12] See footnote 9.

this case does not present the typical *Blockburger*[13] question of whether a person can be convicted of two distinct statutory offenses for the same conduct or transaction.[14] Rather, he claims, it involves alleged multiple violations of the same statutory provisions. The defendant claims that the issue presented is "whether the legislature, in enacting part IX[15] of the penal code, intended multiple robbery convictions where the property of a single business establishment is forcibly taken from two or more employees." He indicates that, contrary to the state's claim, this case is not controlled by *State* v. *Lytell*, 206 Conn. 657, 539 A.2d 133 (1988).

The defendant maintains that the "robbery and related statutes" are "ambiguous" on the question of whether the legislature intended multiple robbery convictions where the property of a single business establishment is forcibly taken from two or more employees, and not whether the legislature intended multiple robbery convictions where the robbery is perpetrated against more than one victim. The defendant contends that this ambiguity exists because robbery is both a crime against property and a crime against the person, and has characteristics of both larceny and assault. This claimed ambiguity, he argues, is magnified by the Penal Code commission comment to § 53a-133, which "does not indicate a preference for applying the principles of larceny or assault [robbery]." See Commission to Revise

---

[13] *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[14] Both the state and the defendant agree that the robbery charges in this case arose out of the same conduct or transaction. At oral argument the defendant maintained that the *Blockburger* test had been satisfied with the result that double jeopardy proscribed his conviction and punishment for the three robbery counts.

[15] Part IX of the penal code is entitled "Larceny, Robbery and Related Offenses" and encompasses §§ 53a-118 through 53a-136. Part IX is also one "part" of chapter 952 of the General Statutes, which in turn is comprised of fourteen "parts."

the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1969).[16] The definition of "owner" in § 53a-118 (a) (5), he contends, also adds to the ambiguity. Because of the claimed ambiguity, the defendant urges the application of lenity to his three robbery convictions, claiming that his double jeopardy rights were violated by his conviction of three counts of robbery in the second degree.

The state concedes that the robbery charges arose out of the same criminal transaction and, consequently, it argues that the issue is whether these crimes represent the same offense. It maintains that where a defendant is convicted of multiple violations of the same statutory provision in a single trial, the proper double jeopardy inquiry is whether the legislature intended to punish the individual acts separately or to punish only the course of action that they constitute. The state claims that *Lytell* forecloses the defendant's double jeopardy claim, maintaining, inter alia, that *Lytell* rejected the defendant's ambiguity argument. Moreover, the state contends, on the basis of the definition of "owner" in the larceny statute (§ 53a-118 [a] [5]), that the bank tellers were clearly "owners," because their right as tellers to possession of the currency was greater than that of the defendant.[17]

"The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall 'be subject for the same offense to be twice

---

[16] The 1969 comment to which the defendant refers is: "This section defines robbery: a larceny accompanied by force or threat. Thus, reference must be made to §§ 53a-118 and 53a-119 for the definition of larceny. The basic rationale is protection against the *terror* of the forcible taking." (Emphasis added.)

[17] We note that the trial court instructed the jury without exception being taken, that " 'owner' means not only the true and lawful owner, but also any person who has a superior right to that of the offender. This would include persons who have possession or custody of property with the permission or authority of the true owner."

put in jeopardy of life or limb . . . .' The double jeopardy clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments [in the same trial] for the *same* offense. . . . The third of these protections is at issue in the present case." (Citation omitted; emphasis added.) *State* v. *Hickam,* 235 Conn. 614, 617–18, 668 A.2d 1321 (1995), cert. denied, 517 U.S. 1221, 116 S. Ct. 1851, 134 L. Ed. 2d 951 (1996). While "[t]he constitution of Connecticut has never contained a provision against double jeopardy . . . [it] has long [been] recognized as a fundamental principle of common law that no one shall be put in jeopardy more than once for the *same* offense." (Emphasis added.) *State* v. *Langley,* 156 Conn. 598, 600–601, 244 A.2d 366 (1968), cert. denied, 393 U.S. 1069, 89 S. Ct. 726, 21 L. Ed. 2d 712 (1969), and cases there cited; *State* v. *Boyd,* 221 Conn. 685, 689, 607 A.2d 376, cert. denied, 506 U.S. 923, 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992); *State* v. *Johns,* 184 Conn. 369, 373 n.6, 439 A.2d 1049 (1981). "[T]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of the *same* statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute. *Albernaz* v. *United States,* 450 U.S. 333, 337, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981) . . . . *State* v. *Rawls,* 198 Conn. 111, 121, 502 A.2d 374 (1985). . . . [That] issue, though essentially constitutional, becomes one of statutory construction." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Lytell,* supra, 206 Conn. 665–66; *State* v. *Madera,* 198 Conn. 92, 109, 503 A.2d 136 (1985). This is in accord with the presumption under the *Blockburger* analysis that double jeopardy is violated where a defendant is given multiple punishments for the same offense. *North Carolina* v. *Pearce,* 395 U.S. 711, 717, 89 S. Ct. 2072,

23 L. Ed. 2d 656 (1969). The presumption is, however, not a conclusive presumption. *State* v. *Nixon*, 32 Conn. App. 224, 238–39, 630 A.2d 74 (1993), aff'd, 231 Conn. 545, 651 A.2d 1264 (1995); *State* v. *Russell*, 25 Conn. App. 243, 251, 594 A.2d 1000 (1991). Rather, it is a presumption that may be rebutted by evidence of clear legislative intent to punish the individual acts separately rather than to punish only the course of action which they constitute. See *State* v. *Freeney*, 228 Conn. 582, 587, 637 A.2d 1088 (1994); *State* v. *Lytell*, supra, 665–66; *State* v. *Rawls*, supra, 121; *State* v. *Nixon*, supra, 239.[18]

The defendant states that "the proper result in this case necessarily turns on the specific statutory text and on the somewhat more global question of whether a robbery is more like a larceny or an assault." In arguing to make such cases as *State* v. *Bunkley*, 202 Conn. 629, 522 A.2d 795 (1987), *State* v. *Madera*, supra, 198 Conn. 92, and *State* v. *Couture*, 194 Conn. 530, 482 A.2d 300 (1984), analytically irrelevant on this claim, the defendant claims that "[t]he clear and focused purpose of those statutes, combined with the overall purpose of criminal law and the specific language directed at the individual, supports an interpretation of legislative intent to allow multiple convictions," whereas "the robbery statute does not have a controlling gloss that indicates a clear legislative intent." In each of those three cases, our Supreme Court found that "the pivotal question was whether the statutes defined crimes against the individual persons" involved. *State* v. *Lytell*, supra, 206 Conn. 666. In *State* v. *Couture*, supra, 566, the Supreme Court stated: "Where crimes against persons are involved, a separate interest of society has been

---

[18] In *Albernaz* v. *United States*, supra, 450 U.S. 344–45 n.3, the United States Supreme Court stated: "We noted in *Brown* v. *Ohio*, [432 U.S. 161, 166, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977)] that the established test for determining whether two offenses are the 'same offense' is the rule set forth in *Blockburger*—the same rule on which we relied for determining congressional intent."

invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there are victims." "The intent of the legislature is to be found in the meaning of the words of the statute; that is, in what the legislature actually *did* say; not in what it *meant* to say." (Emphasis in original.) *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859 (1981); *State* v. *Grant*, 176 Conn. 17, 20, 404 A.2d 873 (1979). This is the rule in the absence of ambiguity. *Furstein* v. *Hill*, 218 Conn. 610, 622, 590 A.2d 939 (1991); *All Brand Importers, Inc.* v. *Dept. of Liquor Control*, 213 Conn. 184, 195, 567 A.2d 1156 (1989). "A statute does not become ambiguous solely because the parties disagree as to its meaning." *Commissioner of Public Safety* v. *Freedom of Information Commission*, 204 Conn. 609, 620, 529 A.2d 692 (1987); *Harris Data Communications, Inc.* v. *Heffernan*, 183 Conn. 194, 198, 438 A.2d 1178 (1981).

The statutory scheme provides that in order to have a robbery there must be a larceny, as that latter crime is defined in General Statutes § 53a-119. See also General Statutes § 53a-118. When a violation of § 53a-119 is committed under the aggravating circumstances set out in § 53a-135 (incorporating § 53a-133), § 53a-135 clearly evinces a legislative intent that robbery is a person and victim oriented crime and, thus, is of a higher order than a crime against property in this statutory scheme. We recognize that it has aspects of a crime against property, but it is clear that its basic thrust is to protect the integrity of the individual. The very language of § 53a-133 underscores this where it provides that robbery takes place, "when, in the course of committing a larceny, [the perpetrator] uses or threatens *the immediate use of physical force* upon *another* person for the purpose of . . . *[p]reventing or overcoming resistance* to the taking of the property or to the *retention* thereof . . . [or] *compelling* the owner . . . or

another person *to deliver up* the property or *to engage in other conduct which aids in the commission of the larceny*." (Emphasis added.) This choice of language by the legislature demonstrates its intent that robbery is to be considered basically a crime against the person.

Furthermore, § 53a-135 incorporates the definition of "robbery" from § 53a-133, which in turn provides that "[a] person commits robbery when, *in the course of committing a larceny* . . . ." (Emphasis added.) The phrase "in the course of" was new to our statutory robbery scheme with the enactment of the penal code. This legislative language focuses not on the offense against property but, rather, clearly on the intrusion by the perpetrator on the physical and mental integrity of the victim.

Giving the language its plain and commonly approved usage not only advances the purpose of the statute, especially the evil to be suppressed, but yields a construction that is consonant with accepted statutory construction. See *Singh* v. *Singh*, 213 Conn. 637, 647, 569 A.2d 1112 (1990); *Kellems* v. *Brown*, 163 Conn. 478, 505–506, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973); *State* v. *Goffe*, 41 Conn. App. 454, 472–73, 676 A.2d 1377 (1996); *State* v. *Gaines*, 36 Conn. App. 454, 458, 651 A.2d 1297 (1994); *People* v. *Shakun*, 251 N.Y. 107, 114, 167 N.E. 187 (1929).

"It has been said that the best construction of a statute is that which it has received from contemporary authority." 73 Am. Jur. 2d, Statutes § 162, p. 365 (1974). Our Supreme Court has said that " '[r]obbery is an offense against the person, the distinguishing characteristic of which is the intimidation of the victim.' " *State* v. *Gaines*, 196 Conn. 395, 400, 493 A.2d 209 (1985), quoting *State* v. *Hawthorne*, 175 Conn. 569, 573, 402 A.2d 759 (1978); see *State* v. *Childree*, 189 Conn. 114,

123, 454 A.2d 1274 (1992). We have said the same. *State* v. *Channer*, 28 Conn. App. 161, 165, 612 A.2d 95, cert. denied, 223 Conn. 921, 614 A.2d 826 (1992). Robbery in the second degree is a crime against the person; it is a crime of violence, and the taking that accompanies this crime is aggravated by the display or threatened use by the perpetrator of what he represents to be a deadly weapon or a dangerous weapon. The penal code commission comment to the legislative definition of "robbery" in § 53a-133 contains the following statement: "The basic rationale is protection against the *terror* of the forcible taking." (Emphasis added.) Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1969), p. 64. Such a comment hardly palliates the violent nature of this crime and its focus on the victim.

We turn to statements of our Supreme Court in *State* v. *Tweedy*, 219 Conn. 489, 497–98, 594 A.2d 906 (1991): "[D]istinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Citations omitted; internal quotation marks omitted.) As concerns § 53a-133, the singular term "another person" has been construed "to evince the legislative purpose that a spatially indistinct robbery of two individuals be punishable as two separate offenses of robbery. See *State* v. *Lytell*, [supra, 206 Conn. 666–67]." *State* v. *Tweedy*, supra, 498. "The plain terms of § 53a-133," which provide that a person "com-

mits robbery when, in the course of committing a larceny, [he] engages in forcible conduct with a proscribed purpose," demonstrates that the legislature has "expressly designated the course of committing a larceny, rather than the course of forcible conduct, as the time frame for completion of the offense of robbery." (Internal quotation marks omitted.) Id., 498–99. Our Supreme Court expressed the view that "[a] fundamental purpose of the criminal law is to protect individual citizens from the criminal conduct of another. People are neither fungible nor amorphous. Where crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there are victims." *State* v. *Lytell*, supra, 666 (robbery). A person who intentionally embarks upon and pursues a course of conduct that includes the use or threat of immediate use of physical force upon three persons for the purposes plainly provided for in our robbery statutes is certainly more culpable than one who threatens only one other person. There is, justifiably, a natural inclination to attribute greater gravity to threatening or endangering several persons rather than one.

Further, in pressing his claim of statutory ambiguity, the defendant argues that the statutory definition of "owner" in § 53a-118 (a) (5) "is at the heart of the problem." This is so, he argues, because the number of owners involved depends upon one's "level of view." At one level, all of the property belongs to the bank thus resulting in one "owner" while, at the other level, each teller has a right to possession superior to that of the robber, with the result that there are three "owners." We see no ambiguity. Section 53a-118 (a) (5) defines "owner" as meaning "any person who has a right to possession superior to that of a taker, obtainer or withholder." There is no question that each of the three

tellers had such a right, as to the currency taken that was superior to that of the defendant. " 'As Justice Holmes put it in *Roschen* v. *Ward*, 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929): "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." ' *State* v. *Roque*, 190 Conn. 143, 153, 460 A.2d 26 (1983)." *Lamb* v. *Burns*, 202 Conn. 158, 168, 520 A.2d 190 (1987). "Common sense should be applied to the language of a penal statute, particularly if otherwise absurdity or frustration of the evident design of the legislature results." *State* v. *Morelli*, 25 Conn. App. 605, 609, 595 A.2d 932 (1991). We conclude that the legislature clearly intended to punish individual acts of robbery separately as to each victim.

We now turn to *State* v. *Lytell*, supra, 206 Conn. 657, which the state argues is controlling on the double jeopardy claim. The defendant claims *Lytell* is not controlling because in *Lytell*, the court addressed a different question than is presented in this case. The defendant argues that the question here is "whether the legislature, in enacting part IX of the penal code, intended multiple robbery convictions where the property of a single business establishment is forcibly taken from two or more employees." Nothing in the relevant statutes or legislative history, he continues, "unambiguously suggests such an intention." *Lytell*, however, he maintains, presented a distinctly different question, and that was "whether the legislature intended multiple robbery convictions where the property of a single business establishment is forcibly taken from the owner and another person." He claims that, "[u]nlike *Lytell*, the plain language of § 53a-133 does not unambiguously suggest that the legislature intended multiple robbery convictions where the *victims* are two or more employees." (Emphasis in original.)

There can be no doubt that in *Lytell* the court held that "when two or more persons are the victims of a single episode there are as many offenses as there are victims." Id., 666. It is true that in *Lytell* the court was not presented with the issue of the robbery of two "employees" of a single business establishment. It was, however, addressing the robbery of two persons in a single business establishment. Nevertheless, *Lytell* is factually distinguishable, given the issue as framed by the defendant to meet the state's claim under that case. We cannot say, therefore, that *Lytell*, as the state claims, is controlling on the double jeopardy claim of the defendant, but it is certainly instructive.

The question to be resolved is whether the legislature intended that where several "employees" of a single business establishment were the victims of robbery, as here, their status as "employees" excluded them from or placed them beyond the intended reach of the term "person" under our robbery statutes. We think not. Sutherland states that "[t]he way to judge the probative force of any textual consideration is by reference to common language usage." 2A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 47.01, p. 137. " 'The words used [in a statute] are to be construed according to their commonly approved usage. General Statutes § 1-1.' " *State* v. *Cataudella*, 159 Conn. 544, 553, 271 A.2d 99 (1970), quoting *Klapproth* v. *Turner*, 156 Conn. 276, 280, 240 A.2d 886 (1968). There is no authoritative basis given us by the defendant, nor do we find any, for concluding that the term "person" as used in the robbery statutory scheme is to be given anything but its common meaning, and that would include a "person" who was an "employee." The legislature even chose to include its own definition section for part IX of the penal code, in which it defined words for purposes of that part that otherwise might be considered words of

common meaning.[19] These definitions did not include "person." Even applying the view that a penal statute should be strictly construed, "the words of a statute are to be construed with common sense and according to the commonly approved usage of the language." (Internal quotation marks omitted.) *State* v. *Millstein*, 8 Conn. App. 581, 598, 513 A.2d 1253, cert. denied, 201 Conn. 814, 518 A.2d 72 (1986). "[A penal] statute should not be read so as to add to, or to subtract from that which is readily found therein." *State* v. *Fisher*, 232 Kan. 760, 762, 658 P.2d 1021 (1983); 3 J. Sutherland, supra, § 59.06, pp. 129–30. It is our duty to "interpret statutes as they are written." *Muha* v. *United Oil Co.*, 180 Conn. 720, 730, 433 A.2d 1009 (1980). " 'Courts cannot, by construction, read into statutes provisions which are not clearly stated.' " *Glastonbury* v. *Gillies*, 209 Conn. 175, 179, 550 A.2d 8 (1988), quoting *Robinson* v. *Guman*, 163 Conn. 439, 444, 311 A.2d 57 (1972). The legislature is quite aware of how to use language when it wants to express its intent to qualify or limit the operation of a statute. There is nothing to demonstrate, as is incumbent upon the defendant, that the legislature intended to exclude any "person," including an employee, or to exclude any locus or venue, including a business establishment, from the reach of the robbery statute as being the scene of a robbery. No such intent is at all evident from the clear text of the robbery statutory scheme in part IX of the penal code, and there is no need here to resort to any other aids of interpretation. See *Mad River Co.* v. *Wolcott*, 137 Conn. 680, 687–88, 81 A.2d 119 (1951). Moreover, when the legislature enacts a statute in general terms, it is assumed the statute will apply prospectively to persons and subjects falling

[19] General Statutes § 53a-118, which is captioned "Definitions *generally*," includes definitions of such common words as "obtain," "deprive" and "receive." (Emphasis aded.) It is informative to note that the legislature has defined the word "person" when it has chosen to do so. See, e.g., General Statutes §§ 34-20, 35-25.

within its terms. *United States* v. *Stokes*, 858 F. Sup. 434, 443 (D.N.J. 1994). The United States Supreme Court has said that where "Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular situation may not have been contemplated by the legislators." *Barr* v. *United States*, 324 U.S. 83, 90, 65 S. Ct. 522, 89 L. Ed. 765 (1945). "[I]t is not the province of the court to do what the legislature chose not to do." *State* v. *Nixon*, 231 Conn. 545, 559, 651 A.2d 1264 (1995), citing *In re Petition of State's Attorney, Cook County, Illinois*, 179 Conn. 102, 106, 425 A.2d 588 (1979).

In sum, we conclude that there was no violation of the defendant's double jeopardy rights under either the United States or the Connecticut constitutions because of his conviction and punishment on the three counts of robbery in the second degree under § 53a-134 in the trial court. Implicit in this conclusion is the determination that the defendant's claims of ambiguity lack merit.[20]

## III

Finally, the defendant claims that his rights under the double jeopardy clause of the fifth amendment to the United States constitution and under Connecticut law were violated by his conviction and cumulative punishment on the offenses of robbery in the second degree in violation of § 53a-135 (a) (2) and the commis-

---

[20] We need not reach the claim of lenity. "The [Supreme] Court has emphasized that the 'touchstone' of the rule of lenity 'is statutory ambiguity.' . . . Where [the legislature] has manifested its intention, [the courts] may not manufacture ambiguity in order to defeat that intent." (Citation omitted.) *Bifulco* v. *United States*, 447 U.S. 381, 387, 100 S. Ct. 2247, 65 L. Ed. 2d 205 (1980). "The rule of lenity [merits application] only if, after reviewing all [applicable] sources of legislative intent, the statute remains truly ambiguous." *United States* v. *McDonald*, 692 F.2d 376, 379 (5th Cir. 1982), cert. denied, 460 U.S. 1073, 103 S. Ct. 1531, 75 L. Ed. 2d 952 (1983); see *United States* v. *Cooper*, 966 F.2d 936, 943 (5th Cir. 1992).

sion of a class C felony with a firearm in violation of § 53-202k. Although this issue was not raised in the trial court, it does involve a fundamental constitutional right and we will review the claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). We, however, "will apply only the traditional federal constitutional analysis" to this claim because "[t]he defendant has not provided a separate analysis under state constitutional law." *State* v. *DePastino*, 228 Conn. 552, 571, 638 A.2d 578 (1994); *State* v. *Russell*, supra, 25 Conn. App. 249–50.

The defendant argues that his right against double jeopardy was violated because he was convicted and punished in a single trial for charges arising out of the same act or transaction,[21] which charges were, in reality, for the same offense. Drawing upon *Blockburger* and its progeny, he contends that the statutory elements of both offenses charged are "virtually identical" and that it is difficult to perceive how a defendant could violate § 53a-135 (a) (2) as charged without also violating § 53-202k. He urges that even if the offenses do not stand in the relationship of "greater" and "lesser" offense and do not satisfy the *Blockburger* test, we should nevertheless find that the offenses as charged were "merely nominally distinct from" each other. The double jeopardy clause prohibits cumulative punishment for nominally distinct offenses if the two offenses are substantially the same. *State* v. *McCall*, 187 Conn. 73, 91, 444 A.2d 896 (1982); *State* v. *Goldson*, 178 Conn. 422, 425, 423 A.2d 114 (1979). We cannot agree with the defendant's claims.

In *State* v. *Anderson*, 211 Conn. 18, 26, 557 A.2d 917 (1989), our Supreme Court, quoting from *Missouri* v. *Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983), stated: "With respect to cumulative sentences

---

[21] The state does not dispute that the charges involved in the defendant's double jeopardy claim arose from the same act or transaction.

imposed in a single trial, the Double Jeopardy Clause does no more than prevent the . . . court from prescribing greater punishment than the legislature intended." (Internal quotation marks omitted.) See *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). Our Supreme Court has also stated: "The application of the *Blockburger* test, however, does not end our analysis of the double jeopardy issue. '[T]he *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history.' *Garrett* v. *United States*, [471 U.S. 773, 779, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985)]; *Missouri* v. *Hunter*, supra, 368; *Albernaz* v. *United States*, supra, [450 U.S.] 340; *Whalen* v. *United States*, 445 U.S. 684, 691–92, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980); *State* v. *John*, [210 Conn. 652, 695–97, 557 A.2d 93 (1989)]; *State* v. *Delgado*, 19 Conn. App. 245, 251–52, 562 A.2d 539 (1989). Double jeopardy protection against cumulative punishments is only 'designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature.' *Ohio* v. *Johnson*, 467 U.S. 493, 499, 104 S. Ct. 2536, 81 L. Ed. 2d 425, reh. denied, 468 U.S. 1224, 105 S. Ct. 20, 82 L. Ed. 2d 915 (1984). 'Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.' *Missouri* v. *Hunter*, supra, 368–69. 'The *Blockburger* test is a "rule of statutory construction," and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent.' *Albernaz* v. *United States*, supra, 340; *Beam* v.

*Foltz*, 832 F.2d 1401, 1411 (6th Cir. 1987), cert. denied, 485 U.S. 980, 108 S. Ct. 1278, 99 L. Ed. 2d 489 (1988). The language, structure and legislative history of a statute can provide evidence of this intent. *Garrett* v. *United States*, supra, 779." *State* v. *Greco*, 216 Conn. 282, 292–93, 579 A.2d 84 (1990). "Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility . . . these are peculiarly questions of legislative policy. *Gore* v. *United States*, 357 U.S. 386, 393, 78 S. Ct. 1280, 2 L. Ed. 2d 1405 [1958]. *State* v. *Darden*, 171 Conn. 677, 679, 372 A.2d 99 (1976)." (Internal quotation marks omitted.) *Plourde* v. *Liburdi*, 207 Conn. 412, 419, 540 A.2d 1054 (1988).

An examination of the express language of the statute in § 53-202k clearly shows that the legislature intended to punish felonious activity under two separate statutes. This is particularly so because it expressly provides for the imposition of a nonsuspendable five year term that is to be "in addition and consecutive to any term of imprisonment imposed for conviction of such felony" albeit A, B or C (felony committed under circumstances as earlier provided in statute). The legislative intent to enhance the punishment under § 53-202k is apparent. As a further indication that § 53-202k states a separate offense for which punishment may be imposed, its non-suspendable consecutive term of five years provision is unique in that it "stands alone and is not based on a multiplier of the penalty for [any of] the predicate offense [that triggers its operation]." See *State* v. *Greco*, supra, 216 Conn. 294–95. It also bears noting that § 53-202k was enacted with other legislation in 1993 to address separate evils presented by the illegal use of various types of firearms.

The two statutes, i.e., § 53a-134 (a) (5) and § 53-202k, are not "merely nominally distinct" from each other; see *State* v. *Perruccio*, 192 Conn. 154, 162, 471 A.2d 632 (1984); nor are they "substantially the same." See *State*

v. *Goldson*, supra, 178 Conn. 425. In short, they are separate offenses. The defendant has failed to show that the *Blockburger* test has resulted in a conclusive presumption requiring a finding of the claimed double jeopardy violation.

The judgments are affirmed.

In this opinion the other judges concurred.