STATE OF CONNECTICUT *v.* ALLEN WILLIAMS
(AC 18343)

Foti, Schaller and Pellegrino, Js.

Argued April 3—officially released June 6, 2000

*Del Atwell,* special public defender, for the appellant (defendant).

*Nancy L. Chupak,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Herbert E. Carlson, Jr.,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Allen Williams, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-48 (a), burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (2) and 53a-8, and conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (2) and 53a-48 (a). The defendant claims that (1) the evidence was insufficient to sustain his conviction, (2) he was denied effective assistance of counsel, (3) the sentence imposed by the trial court was harsh and excessive,[1] (4) the conviction is constitutionally infirm because of the defendant's mental incompetence and (5) the trial court improperly instructed the jury on proof beyond a reasonable doubt. We affirm the judgment of the trial court.

---

[1] The defendant was committed to the custody of the commissioner of correction for a total effective sentence of twenty-five years, execution suspended after seventeen years, followed by five years of probation.

The jury reasonably could have found the following facts. Rose Paternostro, a retired person in her sixties, was part owner and manager of an apartment building at 378-380 South Main Street in New Britain, consisting of four levels, including the basement. On Friday, June 30, 1995, at approximately 3:30 p.m., she was sitting at her desk in her two-room office in the basement of the building next to the staircase leading to the other levels. She was talking on the telephone while wrapping quarters that she had collected from the building's laundry room. She heard a knock on the office door and quickly finished her conversation, placing wrapped quarters in a blue bank envelope on her desk. She then unlocked and opened the door leading to the hallway. At first she did not see anyone. Suddenly, two black men came from either side of the open door. Both wore dark-colored nylon stockings pulled down over their faces, dark clothing, work boots and surgical gloves.

It was daylight outside, and the area was well illuminated because the overhead lights were on in the office. Paternostro was able to get a good look at both men. One of the men was very tall, around six feet, five inches, skinny and light-skinned. She immediately recognized the defendant because of his height and because she could make out his face under the mask. She was familiar with the defendant because he had come to the building several times that spring to visit a tenant who lived on the third floor and because she had, a few days earlier, confronted him and a group of other men about loitering outside of the building. The other robber was shorter than the defendant, around five feet, eight inches tall, had a stocky build and was dark-skinned. He also had been seen around the building.

The men pushed Paternostro backward, causing her to fall to the floor. The shorter one pointed what looked like a gun at her head and one of the men said, "Where's

the money, white bitch?" Paternostro, who was lying on her back looking up at the men, refused to tell them and, instead, stated that she could identify them and that "they wouldn't get away with it." The shorter man responded by kicking her. The defendant went into the inner office while his partner kept the gun pointed at Paternostro's head. When the defendant came out of the inner office, the other robber backed out of the office door and disappeared into the hallway. At that point, Paternostro tried to get up, but the defendant kicked her in the face, causing her to fall back down. He then left the office. Paternostro had kept her attention on both men the entire time that they were there.

Paternostro then ran into the inner office to call the police and discovered that the blue bank envelope, which contained $170 in wrapped quarters, was missing and that the telephone line was dead. She ran out of her office and outside of the building, where she saw tenants Pauline Wiggins, Ralph Haecox and Sandra Lespearance. She told them that she had been robbed. One or two minutes before Paternostro came outside, Wiggins saw the defendant, whom she had known for ten years, and another man she knew as Marron Allen, exit from the far end of the apartment building, and walk through the parking lot and away from South Main Street.

After Paternostro told Wiggins that she had been robbed, Wiggins went to her apartment and called the police. Sergeant Philip Kennedy of the New Britain police department was the first officer to arrive at the apartment building. He found Paternostro inside of her office and observed that she had an injury to her forehead for which he radioed for medical assistance. He noted that she was alert and coherent despite her injury. She told him that she could identify both robbers and that one of the robbers was a very tall, slender, light-skinned black male whose first name she knew to be

Allen. On the basis of this information, Kennedy believed that one of the robbers sounded like the defendant and radioed a dispatch for the defendant's last known address, which he learned was on nearby Cherry Street. He then dispatched officers to that address.

Officer Joseph Lobo of the New Britain police department arrived at the apartment building after Kennedy. He spoke to Paternostro, who also told him that she could identify both robbers, that one of them had a first name of Allen, and that she had dealt with each in the past and recently had spoken to one of them. She agreed to accompany Lobo to the police station to give a formal statement.

Prior to leaving with Paternostro, Lobo was approached by tenant Marie Robles who told him that her daughter had found some articles that she believed might have been used in the robbery. Lobo accompanied Robles to the third-floor landing, where he saw a black nylon stocking and part of a latex surgical glove. The part of the glove found on the landing matched another part that Lobo had discovered in Paternostro's office.

Robles also told police that she had had a conversation with the defendant the day prior to the robbery during which he asked her whether the building had any security guards. Robles responded that it did not and asked the defendant why he wanted to know. The defendant answered that he was just curious.

Lespearance told police that she, too, had a conversation with the defendant on the day prior to the robbery during which she told him that her landlady was looking for him. The defendant had responded, "Fuck the bitch," and that she was going to get everything that she deserved.

After speaking with Robles, Lobo drove Paternostro to the police station. There, she was shown eight photo-

graphs of black men. The photographs were placed in two rows of four on the table in front of her. Lobo asked Paternostro if she could identify anyone in the photographs as the person or persons who had robbed her. She immediately pointed to the defendant's photograph and stated that he was one of the robbers.

Shortly thereafter, Paternostro was taken to a location where the defendant and another person were being detained. She immediately identified the defendant as one of the robbers and stated that his companion was not the other robber. Later, she identified the second robber from a photographic array. The second individual she identified was Marron Allen, whom Wiggins had seen leaving the building with the defendant minutes before Paternostro had emerged from the building and said that she had been robbed. Marron Allen later pleaded guilty to robbing Paternostro.

I

The defendant first claims that the state failed to present sufficient evidence from which the jury could have found beyond a reasonable doubt that he was one of the men who committed the crimes.

"In reviewing [a] sufficiency [of evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 809, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997).

"Every element of the crime charged must be established by proof beyond a reasonable doubt. The basic

facts underlying the elements of the crime charged, however, may be reasonably inferred by the factfinder. *State* v. *Castonguay*, 218 Conn. 486, 507, 590 A.2d 901 (1991). 'If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt.' *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992); *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991)." *State* v. *Milardo*, 224 Conn. 397, 403, 618 A.2d 1347 (1993).

That the evidence is circumstantial rather than direct does not diminish the force of that evidence. *State* v. *Brown*, 235 Conn. 502, 510, 668 A.2d 1288 (1995). "The state must prove every essential element of the crime beyond a reasonable doubt and, while the jury may draw reasonable and logical inferences, it may not resort to speculation. *State* v. *Tucker*, [181 Conn. 406, 417, 435 A.2d 986 (1980)]; *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979)." *State* v. *Green*, 194 Conn. 258, 274, 480 A.2d 524 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

"It is also the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . Thus, the issue of the identification of the defendant as the perpetrator of the crime is peculiarly an issue of fact to be resolved by the jury. . . .

"The test for determining whether the evidence is sufficient to sustain a verdict is thus whether the [trier of fact] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence

was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 150–51, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

The jury had before it evidence that the area was well lighted, that Paternostro kept her attention on both robbers throughout the ordeal, that she was familiar with the defendant's appearance and, in particular, his height and face, and that she was able to see his face under his mask. The jury also had the testimony of Wiggins, Robles and Lespearance, which, in addition to Paternostro's testimony, indicated that the defendant was one of the men who had committed the crimes.

"[I]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Citations omitted; internal quotation marks omitted.) *State* v. *Cintron*, 39 Conn. App. 110, 118–19, 665 A.2d 95 (1995).

We conclude that the evidence presented at trial was sufficient on the issue of identification to support the defendant's conviction beyond a reasonable doubt and that his claim to the contrary is without merit.

## II

The defendant also claims that he was denied effective assistance of counsel and that the sentence imposed was harsh and excessive. We previously have addressed both claims. See *State* v. *Johnson*, 57 Conn. App. 156, 158 n.4, 748 A.2d 334 (2000). "A claim of

ineffective assistance of counsel is not properly raised on direct appeal and should be raised in a petition for a writ of habeas corpus. See *State* v. *Kitt*, 8 Conn. App. 478, 480 n.1, 513 A.2d 731, cert. denied, 202 Conn. 801, 518 A.2d 648 (1986). [W]hen the claim of inadequate counsel is joined with other substantive and procedural claims of error, it is often difficult to make a judgment about the extent to which inadequate counsel has implicated the outcome of the criminal conviction. For that reason, it will ordinarily be necessary to await exhaustion of the direct appeal before the claim of ineffective assistance can be pursued on a petition for [a writ of] habeas corpus. . . . *State* v. *Patrick*, 42 Conn. App. 640, 651, 681 A.2d 380 (1996), quoting *State* v. *Henderson*, 37 Conn. App. 733, 749, 658 A.2d 585, cert. denied, 234 Conn. 912, 660 A.2d 355 (1995).

"The defendant further claims that the trial court imposed a harsh and excessive punishment. [W]e have no discretionary power to modify or overturn a sentence that was within the limits fixed by statute for the offense charged, except where a trial court appears to have abused its discretion. *State* v. *Connelly*, 46 Conn. App. 486, 504, 700 A.2d 694 (1997), cert. denied, 244 Conn. 907, 908, 713 A.2d 829, cert. denied, 525 U.S. 907, 119 S. Ct. 245, 142 L. Ed. 2d 201 (1998). Where the trial court has properly considered all of the offenses proved and imposed a sentence within the applicable statutory limitations, there is no abuse of discretion. Id. The defendant does not claim that the trial court did not properly consider his claim, nor does he claim that the sentence exceeds statutory limits. The defendant's claim, therefore, is nothing more than an appeal for clemency and a request that this court exercise discretionary authority it does not possess; id., 503; and thus is not reviewable by this court. A petition for sentence review . . . is the appropriate vehicle by which to have this claim evaluated. See General Statutes § 51-195 et

seq. . . . *State* v. *Connelly*, supra, 504, quoting *State* v. *Baldwin*, 224 Conn. 347, 370–71, 618 A.2d 513 (1993)." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 57 Conn. App. 158 n.4.

### III

The defendant next argues that his trial counsel should have sought an independent psychiatric evaluation or that the court should have accommodated the issues of his mental competence. This claim is not reviewable. As previously addressed, the defendant cannot raise an ineffective assistance of counsel claim on direct appeal. It also appears that the defendant is arguing that the court sua sponte should have ordered the competency evaluation.

The defendant did not preserve this claim for appellate review, but seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant can prevail on his unpreserved constitutional claim only if all of the following four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." *State* v. *Newton*, 8 Conn. App. 528, 531, 513 A.2d 1261 (1986); see *State* v. *Manfredi*, 17 Conn. App. 602, 621, 555 A.2d 436 (1989), aff'd, 213 Conn. 500, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990).

"A record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion

of law if the record contains the factual predicates for making such a determination." *State* v. *Torres*, 230 Conn. 372, 378–79, 645 A.2d 529 (1994). No such factual predicates can be found in the record. The defendant does not point to anything in the record that should have alerted the court that the defendant might be incompetent to stand trial,[2] nor does the defendant identify anything in the record indicating that he suffered any psychological or psychiatric disability, making him a danger to himself or others.

The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record or to make factual determinations to decide the defendant's claim. *State* v. *Golding*, supra, 213 Conn. 240. We conclude that the defendant has failed to provide an adequate record to review this claim and, thus, fails to satisfy the first prong of *Golding*.

## IV

Finally, the defendant claims that the court improperly instructed the jury as to the state's burden of proving guilt beyond a reasonable doubt by stating that a reasonable doubt is a "doubt that has its foundation in the evidence or lack of evidence." He claims that this instruction unconstitutionally diluted the state's burden of proof. The defendant's claim is unpreserved and has been addressed and rejected by this court. See *State* v. *Ryan*, 53 Conn. App. 606, 611–12, 733 A.2d 273 (1999).

The judgment is affirmed.

In this opinion the other judges concurred.

---

[2] The sole mention of any possible mental impairment of the defendant occurred at sentencing when, for the first time, defense counsel stated that the defendant suffered from attention deficit hyperactive disorder.