STATE OF CONNECTICUT *v.* ROBERT TORRES
(AC 15795)

Lavery, Landau and Healey, Js.

Argued May 30—officially released December 2, 1997

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Robert Torres, was tried before a jury on an information consisting of five counts. The first count charged the defendant with the crime of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a,[1] which conspiracy

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

resulted in the death of Glenroy Gordon. The second count charged the defendant with the crime of murder in violation of General Statutes § 53a-54a, alleging that "with intent to cause the death of Glenroy Gordon, [the defendant] caused the death of Glenroy Gordon by shooting him." The third count charged the defendant with the crime of criminal attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1),[2] alleging that when "acting with the intent to cause a serious physical injury to another person, [he] performed a substantial step in the course of conduct planned to culminate in the commission of the crime, to wit: arming himself with a deadly weapon, going to Allen Drive, and shooting one Will Little." The fourth count charged the defendant with the crime of assault in the second degree with a firearm in violation of General Statutes §§ 53a-60a and 53a-60 (a) (2),[3] alleging that "with intent to cause physi-

General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. . . ."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

[3] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

General Statutes § 53a-60a (a) provides: "A person is guilty of assault in the second degree with a firearm when he commits assault in the second

cal injury to another person, [he] caused such injury to Will Little by using a firearm." The fifth count charged the defendant with the crime of risk of injury to a child in violation of General Statutes § 53-21.[4]

After a jury trial, the defendant was convicted on the first, third and fifth counts. Thereafter, he was sentenced to twenty years on the first count, twenty years on the third count and ten years on the fifth count with the sentences on each to run consecutively, thus resulting in an effective sentence of fifty years.

On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction for the attempted assault charged in the third count and (2) the trial court improperly instructed the jury on the doctrine of transferred intent with regard to the third count. Our resolution of the first claim makes it unnecessary for us to reach the second claim.

The jury reasonably could have found the following facts. On August 7, 1993, at approximately 8 p.m., Gordon was standing near Allen Drive in Hartford and was holding the hand of Tiffany Rodriguez, a four year old girl. Delroy Stone, Wilbur Jolly and Little were also there. Tiffany Rodriguez' mother, Nancy Rodriguez, was sitting in front of her house on the opposite side of

degree as provided in section 53a-60, and in the commission of such offense he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. No person shall be found guilty of assault in the second degree and assault in the second degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

[4] General Statutes (Rev. to 1993) § 53-21 provides in relevant part: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

Allen Drive. A 1981 Plymouth Grand Fury car came slowly down Allen Drive. Four persons were in that car, all wearing hooded sweatshirts. The defendant was sitting on the door out the window of the passenger side holding, on the roof of the car, an automatic gun estimated to be about two feet long with a clip extending downward estimated to be about nine inches long.[5] In that position, the defendant, also known as B-Boy, was facing toward Gordon. The state's witnesses, Nancy Rodriguez, Stone and Jolly, all testified that the defendant started shooting toward Gordon, who then fell to the ground.[6] Before Gordon did so, however, he shouted at Tiffany Rodriguez to run, which she did. Jolly saw Little get shot in the leg. Little was later found with a wound in his upper right leg by a Hartford police officer. Many shots were fired as the Grand Fury moved "very slowly."

There was, however, evidence from Detective James Rovella of the Hartford police department, who interviewed the defendant[7] on June 4, 1994, that gave the jury another perspective on who shot at Gordon. According to Rovella, the defendant admitted that he was in the Grand Fury from which shots were fired toward Gordon on Allen Drive on August 7, 1993. With him in that car were Carlos Ortiz (Mad Dog), who was driving, Diego Lopez[8] (Hippy), who was sitting on the door out the window in the front passenger side, and an individual known as Smiley, who was in the back seat with the defendant. The defendant told Rovella

---

[5] In addition to having been described by one witness of the shooting as an "automatic gun," another witness described it as having a "long barrel." The police never recovered any weapon.

[6] No witness of the shooting testified that any of the other occupants of the Grand Fury fired any shots.

[7] The defendant did not testify at the trial. Rovella wrote a report on the June 4, 1994 interview, which was initiated by the defendant.

[8] Lopez was president of the Hartford chapter of the street gang called Latin Kings.

that three of the persons in that car were armed, but that he was not armed. Ortiz had a nine millimeter weapon, Lopez had a Mack 10 semiautomatic, and Smiley had a Tech 9 weapon.[9]

The defendant took part in the planning and executing of a plan to do a "hit" on Allen Drive on a member of Twenty Love, a rival gang.[10] A "hit" is a shooting and murder. The plan was formulated at a Latin Kings meeting in a garage on Webster Street in Hartford with the orders for the planned incident coming from Melvin Castro. The garage had been rented by Castro. The planned incident, the defendant told Rovella, arose out of a dispute between Twenty Love and the Latin Kings over a gun and a backpack. At the time of the shooting of August 7, 1993, Gordon had not actually been accepted as a member of Twenty Love, but was "going to be." The plan involved a three car operation. One car would go up Coleman Drive, turn left onto Allen Drive and be posted at the west end of Allen Drive. The second car was the Grand Fury, which was driven down Allen Drive and from which the shooting was done. The third car was posted on the east end of Allen Drive. After the shooting, the occupants of the Grand Fury[11] exited it with their weapons, left the area and returned to the garage on Webster Street for a short time. They

---

[9] Tech 9s and Mack 10s are "machine pistols" that are "larger than a handgun, smaller than a rifle."

[10] The information about the planning and execution of the "hit" came into evidence at the trial through Rovella, who related what the defendant had told him of it during their June 4, 1994 interview.

[11] As a result of information given to Rovella by the defendant in the June 4, 1994 interview, Rovella found the Grand Fury used in the shooting behind a Hartford funeral home next to Carlo Ortiz' former home. The car had been spray painted black and did not appear to have been professionally painted. The car had been described as dark blue as of August 7, 1993.

Rovella secured this car and later obtained a search warrant for it. In his search of it, he found a ten millimeter expended shell casing under the backseat, which was sent to the state forensics laboratory for comparison with the casings that were found on the night of the shooting.

then went to a pizza shop on the corner of Park and Wolcott Streets in Hartford where they had a "celebration" of pizza and beer purchased by Castro, who said "it was in return for a job well done."

Mark Castagna, a Hartford police officer, was nearby on Flatbush Avenue in his police cruiser with his partner when he heard gunshots at approximately 8 p.m. on August 7, 1993. Castagna proceeded to Allen Drive where he found Gordon with what appeared to be a bullet hole in his head. Emergency medical personnel responded, and Gordon was taken to Hartford Hospital. Castagna noticed bullet casings at the scene. Aware that a casing is discharged when an automatic or semi-automatic weapon is fired, he proceeded to rope off the scene with yellow crime scene tape. Hartford Police Detective Raymond Cruz,[12] an evidence technician, found twenty-nine shell casings that were of different brands of ammunition. There were seventeen Winchesters, ten Norencos and one Frontier that were for nine millimeter weapons, as well as one PMC that was for a ten millimeter weapon. James Jachimowicz, employed by the Connecticut state police at the forensic science laboratory as a firearm and tool mark examiner, examined those casings. It was his opinion that "[t]he ten Norencos were fired from the same firearm, but they were not fired from the same firearm as the other eighteen nine millimeter fired cartridge cases." Jachimowicz received another PMC cartridge case after having received one PMC cartridge case, and it was his opinion that it was "actually impossible that these ten millimeters could have been fired in the same firearm as the nine millimeters." The two bullet fragments recovered at the autopsy could not be linked to any particular casing because the jacketing material was missing so

---

[12] Cruz also attended the autopsy performed on Gordon where he was given two bullets from Gordon's body.

that there was "no way" that Jachimowicz could "determine whether these two bullets were fired from the same firearm."[13] The casings and the fragments given to Jachimowicz "could have come from anywhere from three to five guns."

On appeal, the defendant claims that there was insufficient evidence to support his conviction under the third count of attempted assault in the first degree of Little. In doing so, he maintains that the state failed to prove that he had the requisite intent to harm Little and that the doctrine of transferred intent cannot be utilized to supply the intent necessary for a conviction of attempted assault in the first degree under General Statutes §§ 53a-49 and 53a-59.

The state, on appeal, in arguing to sustain the conviction on the third count, claims that the intended victim in that count was actually Gordon, not Little. This position is irreconcilable with the state's theory at trial as to the third count. The state's theory of the case at trial is evident, as we will point out, not only from its presentation of evidence and argument to the jury but also from its position as to the trial court's jury instructions concerning the third count.

The thrust of the state's case at trial with regard to Gordon was that the defendant conspired to murder Gordon, as the first count specifically charged, and that he did murder Gordon, as the second count specifically charged. The jury found the defendant guilty of the conspiracy and not of the murder. On appeal, the state now claims that the intended victim in the third count was Gordon. To understand more fully the position of

---

[13] This was so, according to Jachimowicz, "because the jacket would have all the accidental marks that I would be looking for, all of the class characteristics where I could say that these are consistent with the same manufacturer are actually all gone. So what I have is I have two pieces of lead, and that's about as far as I can go with the conclusions."

the state at the trial, certain additional circumstances must be set out.

Count one, conspiracy to commit murder, and count two, murder, of the information explicitly specify Gordon as the alleged and indeed actual target. Count three, on the other hand, does not mention Gordon at all, but does mention Little. That count alleges that while "acting with the intent to cause a serious physical injury to *another person* [who is unnamed], the defendant performed a substantial step in the course of conduct planned to culminate in the commission of the crime, to wit: arming himself with a deadly weapon, going to Allen Drive and shooting one Will Little." (Emphasis added.) In count four, the state returns to its posture, as it did in counts one and two, and specifies the person injured (Little) by the defendant's alleged assault on him with a firearm. The state continues its posture of specifying the alleged victim in the fifth count where it names Tiffany Rodriguez as the alleged victim of the defendant's conduct under the risk of injury to a child charge. Thus, in its five count information, it is only in the challenged third count that the alleged victim is not explicitly named. It is the "another person" language, without explication in that count, that has germinated into the crucial issue in this matter. The defendant reasonably believed that the "another person" in that count referred to Little.

During final arguments to the jury, the state went into great detail about its claims under the murder and conspiracy to murder counts, but said very little as to the remaining three counts (the third, fourth and fifth). It did, however, say that "with respect to Mr. Little, the state does not claim that the injury to him constitutes a serious physical injury as defined by our statutes. And the judge is going to tell you what the elements of the various offenses are, but you'll understand when you hear his explanation that is why the defendant is

charged in connection with this shooting of Will Little with attempted assault in the first degree, the essence of which is attempting to cause a serious physical injury with a deadly weapon by shooting him. And . . . the defendant is also charged with assault in the second degree with a firearm. That is for actually causing a physical injury, albeit not a serious one. And the judge will explain these offenses to you." This language, combined with the absence of any reference to Gordon, contributed to the perception that Little was the victim in the third count.

A more compelling aspect of the state's overall presentation that reasonably led the defendant, the court and the jury to believe that the "another person" in the third count was Little, not Gordon, was the state's inaction and standing mute when the court charged the jury that "if you are not satisfied beyond a reasonable doubt that the defendant was the shooter of Will Little, then you are required to return a verdict of not guilty as to count three."[14] This perception was compounded when, during its deliberations, the jury sent a note saying that it wanted an explanation of counts three and four. The court started its recharge on these two counts by saying: "You'll recall I told you yesterday that *counts three and four deal with Will Little*. He is the alleged victim of the misconduct committed against him. Mr. Will Little."[15] (Emphasis added.) Shortly thereafter, in the same recharge, the court said, "Now the *essence* of this count [three] *charges* that the defendant went to

---

[14] This instruction came immediately after the trial court instructed the jury: "Now if you are not satisfied beyond a reasonable doubt that the defendant was the shooter of Glenroy Gordon, then you are required to return a verdict of not guilty as to count two, charging murder."

[15] "A supplemental charge . . . enjoy[s] special prominence in the minds of the [jurors] because it is fresher in their minds when they resume deliberation." (Internal quotation marks omitted.) *State* v. *Fletcher*, 10 Conn. App. 697, 702, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988), quoting *Arroyo* v. *Jones*, 685 F.2d 35, 39 (2d Cir.), cert. denied, 459 U.S. 1048, 103 S. Ct. 468, 74 L. Ed. 2d 617 (1982).

Allen Drive, Hartford, on August 7, 1993, at or about 8 p.m. with the intent to cause serious physical injury by arming himself with a deadly weapon and shooting Will Little in the left buttock." (Emphasis added.) Again, the state said nothing, nor did the defendant, to correct the trial court as to this recharge. Not only the defendant, but "the prosecution has the responsibility to avoid error by making appropriate objections." See *State* v. *Klose*, 334 N.W.2d 647, 651 (N.D. 1983). Certainly, the defense cannot be faulted for not objecting as there was a reasonable basis for it to believe that the state had been and still was treating the third count as directed to Little.

Moreover, the state's scenario on appeal makes no sense when we consider that the third count charges an *attempted* crime and the "victim" (Gordon, according to the state) was actually killed. One wonders why the state would charge the defendant with *attempt* to assault a victim (who was killed) in the same information in which the defendant was charged with murdering that victim.

The state, as the defendant claims, has attempted on appeal to change its theory of the case from that which it pursued at the trial. To countenance such a course, the defendant argues, would violate his constitutional rights under due process by affirming a conviction obtained on the basis of a theory not presented to the trial jury.

This view is foreshadowed in United States Supreme Court jurisprudence by such cases as *Cole* v. *Arkansas*, 333 U.S. 196, 68 S. Ct. 514, 92 L. Ed. 644 (1948), and *Chiarella* v. *United States*, 445 U.S. 222, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980). In *Cole*, the court agreed with the petitioner's argument that "[t]o sustain a conviction on grounds not charged in the information *and* which the jury had no opportunity to pass upon, deprives the defendants of a fair trial and a trial by jury, and denies

the defendants that due process of law guaranteed by the 14th Amendment to the United States Constitution." (Emphasis added; internal quotation marks omitted.) *Cole* v. *Arkansas,* supra, 200. More to the point, the *Cole* court said that "[t]o conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." Id., 202; see *Presnell* v. *Georgia,* 439 U.S. 14, 16, 99 S. Ct. 235, 58 L. Ed. 2d 207 (1978).

In *Dunn* v. *United States,* 442 U.S. 100, 106, 99 S. Ct. 2190, 60 L. Ed. 2d 743 (1979), where there was no variance between the indictment and proof at trial, "there was a discrepancy between the basis on which the jury rendered its verdict and that on which the [Tenth Circuit] Court of Appeals sustained [the defendant's] conviction." In referring to this discrepancy, *Dunn* said that "[t]o uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process." Id. It also said that "appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial." Id., 107. Later, the court said in *Chiarella,* "[W]e cannot affirm a criminal conviction on the basis of a theory not presented to the jury, *Rewis* v. *United States,* 401 U.S. 808, 814 [91 S. Ct. 1056, 28 L. Ed. 2d 493] (1971), see *Dunn* v. *United States,* [supra, 106] . . . ." *Chiarella* v. *United States,* supra, 445 U.S. 236.

An instructive opinion for this case is that of the United States Court of Appeals for the First Circuit in *Cola* v. *Reardon,* 787 F.2d 681 (1st Cir.), cert. denied, 479 U.S. 930, 107 S. Ct. 398, 93 L. Ed. 2d 351 (1986). In *Cola,* a habeas corpus proceeding, the petitioner had been convicted after a jury trial in the Massachusetts Superior Court. He was given a prison sentence and a fine. On appeal to the Massachusetts Appeals Court,

his convictions were affirmed, and the Massachusetts Supreme Judicial Court denied further review. Neil Cola filed a habeas petition in the United States District Court essentially claiming that he had been denied due process because the state appellate court had affirmed his conviction under the relevant statute on grounds that were never specified in the indictment or presented to the jury. He also claimed that the trial court's jury charge was faulty in that it did not frame the charge in terms by which the jury could have found him guilty under the relevant statute. The District Court denied habeas relief finding that "the theory of guilt upon which the state appeals court affirmed *had* been set forth in the indictment and at trial."[16] (Emphasis in original.) *Cola* v. *Reardon,* supra, 684.

The First Circuit in *Cola* said, "[W]e . . . hold that *Dunn* requires the appellate theory to be set forth in both the indictment *and* the case presented to the jury." (Emphasis in original.) Id., 696. That court reasoned that "in addition to notice, due process requires a trial in which criminal defendants are able to confront the government's case. See *Jackson* v. *Virginia,* 443 U.S. 307, 314, 99 S. Ct. 2781, 2786, 61 L. Ed. 2d 560 (1979) . . . ." *Cola* v. *Reardon,* supra, 787 F.2d 696. The *Cola* court aptly pointed out that the *Dunn* court recognized that "while evidence fully supporting the [government's] appellate theory had been before the jury, the prosecution had not 'built its case' on such evidence.

---

[16] In addition, the District Court decided that, since the petitioner had not objected to the jury instructions when given, he had clearly waived any right to object under Massachusetts law. On appeal, the First Circuit Court of Appeals basically disposed of this facet by saying that "[c]onsideration by us of the charge . . . is not for the purpose of finding error in it, but rather, in the limited context of due process challenges under *Dunn,* to determine the nature of the case before the jury . . . ." *Cola* v. *Reardon,* supra, 787 F.2d 695. The court also said "that in inquiries under *Dunn* as to the case before the jury, consideration by [the First Circuit Court of Appeals] of the charge is both proper and required." Id., 698.

*Dunn,* supra, 442 U.S. at 107 . . . . Accordingly, noted the [*Dunn*] Court, the offense had not been *defined* in terms of the appellate theory, and hence, the presence of such unexplained evidence would not reinstate due process." (Emphasis in original.) *Cola* v. *Reardon,* supra, 699. Because the prosecution in Cola's case had not built its case on the evidence supporting its appellate theory and had left such evidence unexplained, the presence of that evidence, *Cola* held, was irrelevant to the due process violation in that case. Id., 700. The *Cola* court concluded that "Cola has established lack of notice as to the [state's] appellate theory . . . ." Id., 702. "The lack of notice here, under [the state's claim of] harmless variance analysis [which was rejected], suffices to violate due process." Id. It is clear that, quite apart from the failure of notice from the indictment to make a defendant aware of what he has to defend against at trial, a separate and distinct violation of due process will occur where "without specification *at trial* of the appellate theory, [an appellate court] can neither be sure that defendants ever recognized, much less defended against, the *final* [state] rationale of guilt." (Emphasis added.) Id., 701; see also *State* v. *Wulff,* 207 Wis. 2d 144, 152, 557 N.W.2d 813 (1997).

Here, as the state's case went in, as the state argued to the jury and as the trial court charged the jury, the defendant could and did understand that Little was the "another person" whom the defendant was charged with having attempted to assault in the first degree, and not Gordon, as the state argues on this appeal. The defendant's belief at trial was reasonable under the circumstances. The state is attempting on this appeal to have this court review and decide the appeal not on the theory it pursued at trial and on which the challenged conviction was obtained, but on a new theory that it advances for the first time on appeal. The state cannot do so.

This brings us to the defendant's insufficiency of the evidence claim. The defendant did not make any claim of insufficient evidence in the trial court. He now seeks review of it under the *Golding* doctrine. See *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Our Supreme Court has said that "*Jackson* v. *Virginia,* [supra, 443 U.S. 307] compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. There being no practical significance, therefore, for engaging in a *Golding* analysis . . . [the Supreme Court reviewed] the defendant's challenge to his conviction [for insufficient evidence] . . . ." *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993); *State* v. *Adorno*, 45 Conn. App. 187, 194, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997); *State* v. *Laws*, 37 Conn. App. 276, 281, 655 A.2d 1131, cert. denied, 234 Conn. 907, 659 A.2d 1210 (1995).

"Our Supreme Court has stated: In reviewing [a] sufficiency [of evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993); *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg*, 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990)." (Internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 809, 687 A.2d 1279 (1996), cert. denied, 240

Conn. 908, 689 A.2d 472 (1997); *State* v. *Laws*, supra, 37 Conn. App. 281.

"Both § 53a-49 (a) (1) and (2) require that the state prove both intent and conduct to sustain a conviction." *State* v. *Gilchrist*, 25 Conn. App. 104, 110, 593 A.2d 507, cert. denied, 220 Conn. 905, 593 A.2d 970 (1991). Our Supreme Court has said: "There are two essential elements of an attempt under this statute. They are, first, that the defendant had a specific intent to commit the crime as charged, and, second, that he did some overt act adapted and intended to effectuate that intent." *State* v. *Mazzadra*, 141 Conn. 731, 734, 109 A.2d 873 (1954). "[T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Internal quotation marks omitted.) *State* v. *Green*, 194 Conn. 258, 276, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985); *State* v. *Wilson*, 30 Conn. 500, 506 (1862).

At trial, the state presented no evidence of the defendant's intent as to Little.[17] There is no evidence that the defendant even knew Little or knew that Little was at the scene of the shooting. The defendant's June 4, 1994 statement, taken about ten months after the shooting, does not refer to Little. Detective Rovella, who took the statement from the defendant, did not testify concerning the defendant's "knowledge" of Little.

The state put on Delroy Stone, an eyewitness to the shooting, and questioned him regarding Little as follows:

"Q. Now you said that Will Little is someone that was there, is that correct?[18]

---

[17] Little did not testify at the trial.

[18] This is the first mention of Little by the state, the defendant or any witness at the trial. Stone testified after six other witnesses, including another eyewitness, Nancy Rodriguez.

"A. Yeah.

"Q. And did you see where Will Little ran?

"A. No.

"Q. Okay. Did you see Will Little again in a short while?

"A. Yes.

"Q. Where did you meet up with him?

"A. After everything went down to Flatbush down there they have an ambulance down there, everything.

"Q. You saw him on Flatbush Avenue where the ambulance came to?

"A. Yeah.

"Q. Okay. Did you see any wounds on him?

"A. At that time yeah, he got a wound on his butt.[19]

"Q. Okay. And was it on the left side or the right side, if you remember?

"A. I don't quite remember."

The state also showed Stone a photograph of Little, and Stone identified it as a photograph of Little.[20]

The state thereafter put on the eyewitness Wilbur Jolly and questioned him about Little as follows:

"Q. Do you know someone by the name of Will Little?

"A. Yes. Chill.

"Q. What's the name that you call him, Chill?

"A. Chill Will, yes.

---

[19] "A bullet wound is not per se serious physical injury. Such a determination is a question of fact for the jury." *State* v. *Huckabee*, 41 Conn. App. 565, 570–71, 677 A.2d 452, cert. denied, 239 Conn. 903, 682 A.2d 1009 (1996).

[20] The defense asked no questions of Stone about Little.

"Q. Was he there [on Allen Drive]?

"A. Yes . . . .

"Q. What did you see when you ran?

"A. Then I see my boy Chill get shot.

"Q. Did you see where he got shot on his body?

"A. In the leg.

"Q. Could you see who was doing the shooting?

"A. Yes.

"Q. Who? Who are you pointing at?

"A. B-Boy.

"Q. That's the person known as Robert Torres?

"A. Yeah."

In addition, the state put on Hartford police officer Brian Heavren who was in the area and, upon hearing gunshots, came and, in the course of checking the area, found Little in the rear of a building on Flatbush Avenue. He took Little to the hospital at that time. The state also put on Linda Crabbe, the physician who treated Little at the hospital on the night of the shooting.[21] Neither of these witnesses testified about anything relating to the circumstances surrounding Little's shooting. Significantly, the treating physician, Crabbe, was not asked by the state about the seriousness of Little's injury. Without evidence that the defendant knew Little or knew of his presence on Allen Drive, the jury cannot have had a basis to find that the defendant possessed the required intent to injure Little seriously.

Moreover, at trial, the state presented no alternative evidentiary basis for proving the required intent for the

---

[21] The bullet was not removed from Little and, therefore, not recovered by the police and tested forensically.

assault of Little under the third count. Although the court did charge on transferred intent,[22] the state, in its brief, stated that "no theory of transferred intent was placed before the jury. The state never argued to the jury that it should utilize transferred intent to convict the defendant of attempted assault. . . . [T]ransferred intent is simply not necessary because injury is not an essential element of criminal attempt. . . . [T]rans-ferred intent is not needed to convict a defendant whose aim was poor of attempted assault. . . . [T]he defen-dant's injection of 'transferred intent' into this appeal is misleading." "The issue in this appeal is *not* whether the doctrine of 'transferred intent' applies to attempt liability generally. The state agrees it does not." (Emphasis in original.) "The defendant's injection of transferred intent into this appeal is a red herring because transferred intent was irrelevant to the defen-dant's attempt to assault Gordon, not Little." "The court's explanation of transferred intent was only inci-dental to explaining the elements of assault in the first degree to the jury . . . ." "Moreover, in the context of the charge as a whole, the evidence presented, and the state's closing argument, the jury necessarily under-stood that transferred intent was not the basis of the

---

[22] The transferred intent instruction was given with the instruction on the intent element of first degree assault and immediately before the instruction on the next element of first degree assault. It was as follows:

"The next element the state must prove is that acting with that intent the defendant caused serious physical injury to another person. You'll recall my prior instructions to you on why on this count the state has charged the defendant with an attempt, because the state was not claiming that the evidence submitted established as concerns Will Little that he sustained a serious physical injury.

"*Now, it does not matter whether the victim was the person upon whom the defendant intended to inflict serious physical injury, if in fact you find such intent. It is sufficient, if you find that the defendant intended to cause serious physical injury to another person and that he in fact caused serious physical injury to that person or some other person. The law does not require that the person injured be the defendant's intended victim.*" (Emphasis added.)

charge of criminal attempt."[23] These statements from the state's brief are disingenuous keeping in mind that the state did not object to or seek clarification of the trial court's instructions on transferred intent.[24]

The state also suggests that "simultaneous intention" supports the claim that Gordon was the victim in the third count just as he was in the second count charging murder and in the first count charging conspiracy to commit murder, and there it refers to *State* v. *Williams*, 237 Conn. 748, 757, 679 A.2d 920 (1996). It is true that *Williams* said: "We conclude that, under the appropriate circumstances, a defendant can simultaneously intend to cause the death of, and intend to cause serious physical injury to, the same victim." Id. In *Williams*, the court found the trial court's instruction to that effect to be proper under the circumstances of that case. *Williams*, however, is not this case. In *Williams*, the trial court specifically charged on "simultaneous intention." Here, it did not. This alone serves to distinguish the present case.

There is no question but that the defendant went to Allen Drive on the night of the shooting with his confederates as the result of the earlier planned objective of killing Gordon. As the state presented its case, there was no claim that the defendant intended to cause serious physical injury to Gordon. The state claimed that the defendant actually murdered Gordon, but the jury found otherwise. The crime of attempted first degree assault, from the state's posture at trial as set

---

[23] We note that with reference to attempt crimes, *State* v. *Hinton*, 227 Conn. 301, 630 A.2d 593 (1993), did not, as the defendant claims, say that transferred intent did not apply to attempt crimes generally, but it did say that "[u]nder the circumstances of this case, the rule of lenity leads us to conclude that the transferred intent doctrine should not be applied to the crime of attempted murder." Id., 318.

[24] It is true that the defendant also did not object and that he also argues that transferred intent does not apply and that it was error by the trial court to have given that instruction.

out earlier, demonstrates that it truly regarded Little, not Gordon, as the victim in that count. We have already set out the state's evidence adduced against the defendant vis-a-vis Little as the victim the third count. It is totally insufficient to prove that the defendant had the requisite intent necessary for conviction in that count. That conviction violates this defendant's federal constitutional due process rights.

It is concluded that, when evaluated under the appropriate standard, the evidence in this case is constitutionally insufficient to support the defendant's conviction of attempted assault in the first degree.

The judgment as to the third count is reversed and the case is remanded with direction to render judgment of acquittal as to the third count.

In this opinion the other judges concurred.