STATE OF CONNECTICUT *v.* DONNIE LEWIS
GILBERT
(AC 16536)

Landau, Spear and Healey, Js.

Argued December 15, 1998—officially released April 6, 1999

*Conrad Ost Seifert*, with whom, on the brief, was *William W. Fisher, Jr.*, for the appellant (defendant).

*Michael L. Regan*, senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The sole issue[1] of this appeal is whether there was sufficient evidence[2] to prove beyond a reasonable doubt that the defendant was guilty of possession

---

[1] Although the defendant raised and briefed two other issues, he expressly withdrew those issues during oral argument before this court. The two issues expressly abandoned were (1) whether, when the police threw away a paper bag that contained a plastic bag with thirteen plastic packets of crack cocaine, the defendant's right to due process under the fourteenth amendment to the United States constitution was violated and (2) whether the trial judge improperly refused to admit certain hearsay testimony, which was an admission against interest, and, accordingly, admissible under that exception to the hearsay rule.

[2] The trial court denied the defendant's motion for a judgment of acquittal made at the completion of the state's case. The defendant went on to present

of a narcotic substance, i.e., cocaine, with the intent to sell in violation of General Statutes § 21a-278 (b).[3] We find the evidence sufficient to support the defendant's conviction, and we affirm the judgment.

The jury reasonably could have found the following facts. On December 6, 1995, at about 8:30 p.m., Trooper Robert Bardelli of the Connecticut state police and Officer Sean Dautrich of the New London police department were both assigned to the east office of the statewide narcotics task force.[4] At that time, they were conducting surveillance on Summer Street, an area of high volume

his evidence but did not make a motion for judgment of acquittal at the end of all of the evidence. The state argues, invoking the waiver rule, that the defendant has waived his right to appellate review as to his sufficiency claim because, although he made a motion for judgment of acquittal at the end of the state's case, he did not make such a motion at the end of all of the evidence. The state cites *State* v. *Glenn*, 30 Conn. App. 783, 790, 622 A.2d 1024 (1993), for this proposition. We do not agree with the state's claim.

The waiver rule, set out in *State* v. *Rutan*, 194 Conn. 438, 440–45, 479 A.2d 1209 (1984), has often been criticized by our Supreme Court. See, e.g., *State* v. *Simino*, 200 Conn. 113, 118 n.5, 509 A.2d 1039 (1986); *State* v. *Lizzi*, 199 Conn. 462, 464–65, 508 A.2d 16 (1986); *State* v. *Duhan*, 194 Conn. 347, 352, 481 A.2d 48 (1984). *State* v. *Roy*, 233 Conn. 211, 212–13, 658 A.2d 566 (1995), requires that we review the evidence in toto when there is a claim that the evidence is insufficient to sustain the conviction; we are not limited to the evidence in the state's case-in-chief. See also *State* v. *Garrett*, 42 Conn. App. 507, 514 n.6, 681 A.2d 362, cert. denied, 239 Conn. 928, 929, 683 A.2d 398 (1996). In *Jackson* v. *Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), the United States Supreme Court held that it is a violation of the fourteenth amendment to the United States constitution for any person to suffer a criminal conviction except on sufficient proof of every element of the crime charged beyond a reasonable doubt. That is the circumstance involved in this case. We believe, therefore, that the defendant's sufficiency claims should be reviewed on all of the evidence adduced at his trial.

[3] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . possesses with the intent to sell or dispense . . . to another person any narcotic substance . . . except as authorized in this chapter, and who is not at the time of such action a drug-dependent person . . . shall be imprisoned . . . .

[4] Bardelli had been a state trooper for twelve and one-half years, and Dautrich had been a municipal police officer for about four years.

drug activity. Bardelli and Dautrich had received information of drug activity at a two-story house located at 33 Summer Street.[5] The officers had set up their surveillance on December 6, 1995, for the purpose of gathering information to be used at a later date. Both officers were in plain clothes and were seated in an unmarked car across the street from 33 Summer Street approximately seventy-five to 100 feet away. Although it was night, there was sufficient lighting. There was a light on the front porch of 33 Summer Street, and the house was illuminated by streetlights, although there was no streetlight directly in front of the house. Traffic on that section of Summer Street is one-way.

During their surveillance, the two officers saw five or six males in front of 33 Summer Street. They recognized several men including the defendant, Douglas Foy and Harry McMurray. Dautrich was acquainted with the defendant because Dautrich's beat included Summer Street. Both the defendant and Foy are black males and wore dark rain suits. The defendant is taller than Foy.

During the surveillance, the officers observed the defendant come down the front porch stairs of 33 Summer Street and meet vehicles that came down Summer Street and stopped at that address. The defendant would lean into a stopped vehicle, then stand up and that vehicle would leave the scene. At that point, the defendant would go around to the side of 33 Summer Street, out of the sight of both Bardelli and Dautrich for a short period of time, and come back and stand near the doorway as he had earlier. The officers observed the defendant repeat that process on at least three occasions. Although Bardelli said that he did not see an

---

[5] There were two residential apartments in this building. The first floor apartment was 35 Summer Street and the second floor apartment was 33 Summer Street. There was only one front entrance to both apartments from Summer Street. For purposes of convenience, we shall refer to this building as 33 Summer Street.

exchange of items between the defendant and the vehicles' occupants, he believed on the basis of his training and experience that he was observing narcotics transactions.

Additionally, on at least two occasions, the officers saw the smaller black male in a rain suit do the same thing as the defendant. There were also people walking up to the two men in the rain suits and to Bardelli "it looked like they were making exchanges."

Thereafter, about twenty-five minutes into their surveillance, a clearly marked New London police cruiser pulled up to 33 Summer Street. This cruiser was occupied by Officers Joohno Song and Kyle Baskett.[6] Each officer was in uniform. Both Song and Baskett were unaware of the surveillance being conducted by Bardelli and Dautrich. As the cruiser approached 33 Summer Street, Song noticed four to five people on the porch and front steps of that building. He turned on the cruiser spotlight and Baskett turned on the left alley light[7] to make the area more visible. Song recognized three persons, Harry McMurray, James Cook[8] and the defendant. Baskett recognized three persons, including the defendant, who was standing in the doorway. When the alley light was put on, the defendant and the shorter male in the dark rain suit both ran inside the front door of 33 Summer Street. The defendant and the shorter male were the only ones who fled when the area was illuminated by the cruiser lights. As Song and Baskett were exiting their cruiser, they heard a message on their

[6] Officers Song and Baskett were assigned to the safe neighborhood patrol in New London, which specifically targeted areas that had a higher crime rate than the rest of the city, and focused on areas of drug activity and violence. Summer Street was one of the targeted areas.

[7] Alley lights are located on each side of the light bar, which is affixed to the top of a police cruiser.

[8] McMurray and Cook were drinking at that time and held open containers of alcohol. Song knew both of these men as drug users and not as drug sellers.

radio from Dautrich to stop the two men that were going inside the house. Bardelli and Dautrich then exited the unmarked car and joined the pursuit. Bardelli and one of the uniformed officers went into the house and ran upstairs. Bardelli observed the two men in the rain suits run up the stairs to the second floor.[9] Dautrich had gone to the rear door of the building, which was shut and barred access. Later, he was joined at the rear of the building by Song.[10]

At about 8:30 p.m. on December 6, 1995, Melissa Caisse was in the second floor apartment of 33 Summer Street. She had come there with a friend, Beatrice White, to see Joey Lewis' daughter. Although this was Lewis' apartment, Lewis was not there at that time. Several people other than Caisse and White were also in the apartment, including a person named Justice and one named Chicago. The defendant and Foy came into the apartment after these people had arrived. Thereafter, there was a knock on the door whereupon the defendant and Foy immediately went out the back door of the apartment. No one else left the apartment. A woman answered the door. Bardelli told her that they were police officers and that they had seen two people run up to the second floor. She said that nobody had run into the apartment. Although the officers looked around the apartment, they did not see the two persons they had pursued up the stairs.

[9] Annie Branch, who lived in the first floor apartment, testified that on the night of December 6, 1995, police knocked on her door and asked if "anybody [had] come to [her] house" and she said that no one had. She said she knew that the police went upstairs because she heard their footsteps. Joey Lewis was the tenant of the second floor apartment.

[10] Song had been in front where he had detained McMurray and Cook, patted them down for weapons and narcotics, took their information, checked them for warrants and, upon clearing them, released both men. Later, Song heard someone say on the radio that "they were trying to get out the back." Thereupon, Song ran around to the side of the building and covered a side door.

In the meantime, Dautrich remained downstairs outside the closed rear door of the building. That door had several panes of glass covered by a curtain. Two persons were attempting to exit the back door. Suddenly, the curtain on the door moved and Dautrich saw the defendant looking out at him. Dautrich also saw another person with the defendant but did not recognize him. Both individuals inside then ran up the rear stairs.

Bardelli heard somebody shout that the two men were trying to get around to the back of the house. Bardelli and the police officer with him went through the back door of the second floor apartment that led to a foyer, which accessed the rear part of the house. In the foyer, they found piles of trash bags and the defendant and Foy in rain suits hiding among the garbage bags. The officers pulled both from among the garbage bags and brought them back into the Lewis apartment. They checked each of them for weapons and narcotics, but found nothing.[11]

Bardelli then told some of the officers[12] to look around the side of the building where they had observed the defendant during their surveillance and to check the area for narcotics. Dautrich, Song and Baskett took part in this search. Baskett discovered a paper bag under a set of stairs to a side door. Inside the paper bag was a plastic bag in which were thirteen smaller bags containing a white rock-like substance. The paper bag, however, was discarded by the police as they

[11] Upon questioning people in the apartment, the police learned that Lewis was at Foxwoods Casino. The police asked the Foxwoods state police unit to locate Lewis and to have her contact them. Lewis did contact the police, who told her there was an emergency and asked her to come to 33 Summer Street. She did so, arriving between 9:30 and 9:45 p.m. The police asked for her permission to search the entire apartment and she consented. On searching the apartment, the police found a large amount of money, cell phones, beepers and bullets.

[12] Several other New London police officers had arrived to assist the police officers already on the scene.

already had the plastic bag containing thirteen individual bags. Those bags were turned over to Bardelli. Field testing performed by Bardelli and Dautrich was positive for the presumptive presence[13] of cocaine. Tests later performed by the state toxicology laboratory found that the substance contained crack cocaine.

After the crack cocaine was found, Bardelli arrested the defendant[14] and seized $479 and a beeper from him. The defendant was unable to tell Bardelli how much money he had on his person and refused to tell him where he had obtained the money. At the time of his arrest, the defendant was not employed but did odd jobs for which he did not receive pay stubs.

The state's expert testified that in December, 1995, the price of a single rock of cocaine in New London was approximately $20, sometimes, two for $35. According to expert testimony at the trial, when a person is in possession of thirteen bags of crack cocaine, such possession is more consistent with possession with intent to sell than with possession for personal use. Often street level dealers, fearful of apprehension or theft, do not keep the drugs they offer for sale on their own person. There was expert testimony that drugs are kept close to the scene of the sale in an area that is accessible to dealers and that "gives them a certain control over the amount of drugs in the stash."

The standard of review for a sufficiency of the evidence claim is well settled. "Our Supreme Court has stated: 'In reviewing [a] sufficiency [of evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict.

[13] The presumptive presence of cocaine is why the police send contraband to the state toxicology laboratory for further testing.

[14] Foy was not arrested by Bardelli because he was not sure that he was the second individual selling narcotics. According to Bardelli, the defendant "was the only one that I could actually say I identified him, what he looked like, his facial features."

Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.' . . . *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993); *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg*, 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990)." *State* v. *Ingram*, 43 Conn. App. 801, 809, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997); see also *State* v. *Torres*, 47 Conn. App. 205, 219, 703 A.2d 1164 (1997).

In *Ingram*, this court said: " 'We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence. rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989).' *State* v. *Lago*, 28 Conn. App. 9, 30, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992). It has been 'repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. *State* v. *Haddad*, 189 Conn. 383, 390, 456 A.2d 316 (1983); *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981). It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. *State* v. *Perez*, supra, 227 . . . . *State* v. *Braxton*, [196 Conn. 685, 691, 495 A.2d 273 (1985)].' . . . *State* v. *King*, 216 Conn. 585, 602, 583 A.2d 896 (1990); *State* v. *Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984). '[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable

doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' . . . *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992)." (Emphasis in original.) *State* v. *Ingram*, supra, 43 Conn. App. 810.

It bears repeating that " '[i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence.' *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996). 'As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt; *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994); *State* v. *Patterson*, [229 Conn. 328, 332, 641 A.2d 123 (1994)]; *State* v. *Little*, 194 Conn. 665, 671–72, 485 A.2d 913 (1984); nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty.' . . . *State* v. *DeJesus*, supra, 196; see also *State* v. *Sivri*, [supra, 231 Conn. 134]." *State* v. *Torres*, 242 Conn. 485, 490, 698 A.2d 898 (1997).

Furthermore, we are aware that "[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence; *State* v. *King*, [supra, 216 Conn. 602]; rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict of guilt beyond a reasonable doubt. Moreover, '[i]n reviewing the jury verdict, it is

well to remember that [j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct.' . . . *State* v. *Little*, supra, 194 Conn. 674." *State* v. *Ford*, supra, 230 Conn. 693.

"In order to prove possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence and exercised dominion and control over it. . . . Where, as in the present case, the contraband is not found on the defendant's person, the state must proceed on the alternate theory of constructive possession, that is, possession without direct physical contact. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . *State* v. *Frazier*, 39 Conn. App. 369, 378–79, 665 A.2d 142 (1995)." (Internal quotation marks omitted.) *State* v. *Thompson*, 46 Conn. App. 791, 797–98, 700 A.2d 1198 (1997); see also *State* v. *Brunori*, 22 Conn. App. 431, 435–36, 578 A.2d 139, cert. denied, 216 Conn. 814, 580 A.2d 61 (1990).

In our analysis, we recognize that "it is well settled that if the contraband is found in a place where the defendant does not have exclusive possession, the presence of the defendant near the contraband *without more* is insufficient to support an inference of possession. See *State* v. *Alfonso*, [195 Conn. 624, 634–35, 490 A.2d 75 (1985)] . . . ." (Emphasis added.) *State* v. *Brunori*, supra, 22 Conn. App. 436. The evidence before the jury permitted it to draw properly the inference of

constructive possession. Summer Street was particularly well known for its high level of narcotic transactions. During their surveillance of 33 Summer Street on December 6, 1995, the police observed the defendant on at least three occasions come down from the front porch as a motor vehicle stopped at that address, lean into the car and then stand up. The police believed that they were observing narcotic transactions on those occasions. The vehicle would leave the scene, and the defendant would go around the side of the house out of sight of the police for a short period of time and then return to the front porch. On the basis of his training and experience, Bardelli believed that the defendant was hiding his narcotics on the side of the building.

In addition, Bardelli assumed, on the basis of his experience, that when the defendant went around the side of the building, he was replenishing his supply of narcotics. James Morin, an expert witness who had made approximately 400 drug related arrests, testified that street level drug dealers, cautious of apprehension or theft and often feeling that "possession is nine tenths of the law," tend to take precautions and do not keep drugs on their person. Rather, they choose to keep the drugs in a stash location, accessible and close to their operations, where they can maintain control over the narcotics.

Moreover, when the police presence became evident, only two of the individuals outside 33 Summer Street fled, the defendant and Foy. They fled upstairs into Lewis' apartment. When the police knocked on the door of that apartment, the defendant and Foy were the only ones who left by the back door. Such conduct, when unexplained, as in the present case, tends to prove a consciousness of guilt. *State* v. *Ferrara*, 176 Conn. 508, 516, 408 A.2d 265 (1979); *State* v. *Reddick*, 36 Conn. App. 774, 787, 654 A.2d 761, cert. denied, 232 Conn. 922, 656 A.2d 671 (1995). Furthermore, the efforts of the

defendant to conceal himself from the police among the trash bags in the back foyer of the second floor could be found to be evasive action, which would support an inference of consciousness of guilt. See *State* v. *Williams*, 27 Conn. App. 654, 663, 610 A.2d 672 (1992), cert. denied, 223 Conn. 914, 614 A.2d 829 (1992). "When considered together with all the facts of the case, flight may justify an inference of the accused's guilt. *State* v. *Rosa*, 170 Conn. 417, 433, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976)." *State* v. *Reddick*, supra, 787. "Suspicious action on the part of a defendant can also bolster a constructive possession theory." *McNulty* v. *State*, 655 A.2d 1214, 1218 (Del. 1995).

It is true, however, that there is no evidence that the police actually saw the defendant under the stairs on the side of 33 Summer Street where Officers Baskett and Song found the thirteen bags of crack cocaine. The jury had, together with all the other evidence, a photograph[15] of the stairs under which the cocaine was found. That could assist the jury in understanding that the defendant's trips to the side of the building provided ready access to his supply of drugs. Moreover, unlike *State* v. *Brunori*, supra, 22 Conn. App. 431, a case stressed by the defendant, these narcotics were not found in a public area. In *Brunori*, the narcotics were found in a public area within a public housing project in Bridgeport where the defendant allegedly had gone to purchase drugs. We conclude that the jury could have reasonably found that the location of the cocaine under the stairs along the side of the building was not a public place as was the location in *Brunori*. Black's Law Dictionary (6th Ed. 1990) defines public place as "[a] place to which the general public has a right to resort; not necessarily a place devoted solely to the uses of the public, but a place which in point of fact

---

[15] There were also other photographs of 33 Summer Street in evidence.

is public rather than private . . . ." The trier of fact could have, under all of the circumstances, reasonably found that the cocaine was concealed, not in a publicly accessible area as were the drugs in *State* v. *Thompson*, 20 Conn. App. 290, 293, 567 A.2d 837 (1989), but in an area privately accessible to the defendant, secreted there in furtherance of his dominion and control.

Additionally, evidence found on the defendant's person at the time of his arrest further supports the trier's inference of constructive possession. At that time, the police found $479[16] in his possession. The defendant, when asked, could not say how much money he had. Moreover, he was unemployed at that time. As to the beeper taken from the defendant, Bardelli testified that, on the basis of his training and experience, "many individuals who sell narcotics use beepers to have people contact them in order to obtain the narcotic."

There is also expert testimony that possession of the amount of cocaine seized here was more consistent with an intent to sell than possession for personal use. "Possession of narcotics in quantities ordinarily not associated with personal use is a factor on which a jury reasonably may rely to infer intent to sell. *State* v. *DeWitt*, 28 Conn. App. 638, 640–42, 611 A.2d 926, cert. denied, 224 Conn. 903, 615 A.2d 1045 (1992); *State* v. *Napoleon*, 12 Conn. App. 274, 283–85, 530 A.2d 634, cert. denied, 205 Conn. 809, 532 A.2d 78 (1987)." *State* v. *Conley*, 31 Conn. App. 548, 560, 627 A.2d 436, cert.

---

[16] The denominations constituting the $479 taken from the defendant by the police were: eighteen $20 bills, eight $10 bills, seven $5 bills and four $1 bills. In view of the expert testimony of the street price of rock cocaine in New London of $20 and $35, the denominations making up the $479 seized from the defendant could reasonably be considered by the jury.

In a possession with intent to sell cocaine case, it was noted that "[v]ery indicative is the large miscellany of money carried in specie by the defendant, who was otherwise confessedly without any resources and unemployed to boot." *Commonwealth* v. *Sendele*, 18 Mass. App. 755, 758–59, 470 N.E.2d 811 (1984).

denied, 227 Conn. 907, 632 A.2d 696 (1993), see also *State* v. *Smith*, 46 Conn. App. 321, 326, 699 A.2d 262 (1997). The jury could have accepted the expert opinion on the quantity of cocaine as evidence of intent to sell. Even if it did not, the jury still could have reasonably inferred the necessary intent to sell, given all of the circumstances disclosed by the evidence.

The evidence was sufficient to infer the defendant's constructive possession of the cocaine and the jury reasonably could have concluded on the facts established and the reasonable inferences drawn therefrom that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.